UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Nicole Smith-Emerson**

    **v.**

**Liberty Life Assurance
Company of Boston**

Civil No. 14-cv-120-PB
Opinion No. 2015 DNH 224

MEMORANDUM AND ORDER

Nicole Smith-Emerson sued Liberty Life Assurance Company of Boston ("Liberty") under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), challenging Liberty's decision to terminate her long-term disability benefits. In April 2015, I denied Smith-Emerson's request for de novo review of Liberty's termination decision, and instead determined that the decision would be judged by the more deferential "arbitrary and capricious" standard of review. Doc. No. 18. Both parties have now filed motions for judgment on the administrative record. For the reasons that follow, I grant Liberty's motion for judgment on the administrative record.

I.  BACKGROUND

Nicole Smith-Emerson, a 45-year old Concord woman, was struck in the head with a soccer ball in October 2008.[1] Doc. No.

---

[1] The parties have submitted a comprehensive joint statement of

14 at 3.  That blow created a host of medical problems for Smith-Emerson that ultimately led her to quit her job, seek disability benefits, and file suit in this court when her benefits were terminated.

From March 2008 until December 2011, Smith-Emerson worked as a loan officer for Citizens Bank in Concord.  Her job as a loan officer involved mostly sitting and typing, but also occasional driving, walking and lifting 10 pounds or less.  Doc. No. 14 at 1.  In an Occupational Analysis Report, vocational rehabilitation counselor Bonnie Huggins characterized Smith-Emerson's occupation as "sedentary" or "light physical demand."[2] Id. at 13.

As a Citizens employee, Smith-Emerson was entitled to disability benefits under the bank's employee benefits policy (the "Plan"), should she become "disabled."  Id. at 2.  The Plan

---

material facts pursuant to Local Rule 9.4(b).  Doc. No. 14. Here, I recite only those facts necessary to put this order in context.

[2] Huggins' report described "sedentary" work as "exerting up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently" and "involv[ing] walking or standing for brief periods of time."  AR 733-34.  "Light" work was described as "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently . . . and/or a negligible amount of force constantly."  AR 734.

defined "disabled" to mean "unable to perform the Material and Substantial Duties of [one's] Own Occupation" due to "Injury or Sickness." Id. Liberty funds and administers Citizens' Plan. Id.

In December 2011, due to ongoing neck pain and other complications, Smith-Emerson left her job and filed a claim with Citizens for long-term disability benefits. Id. at 3. Liberty granted her short-term disability benefits until July 2012, when it began paying her long-term disability benefits under a "reservation of rights."[3] Id. at 18.

Between 2011 and 2014, Smith-Emerson saw a myriad of doctors to treat her pain. Neurosurgeon Tung Nguyen performed surgery on Smith-Emerson's neck in October and November 2011, and continued to treat her neck pain over the next two years. See id. at 3-5, 7. On December 8, 2011, Dr. Nguyen signed a "restrictions form" stating that Smith-Emerson was unable to work on a full-time basis. Id. at 4. Soon after, however, on December 20, 2011, Dr. Nguyen signed another form indicating

---

[3] The reservation of rights letter indicated that Liberty's granting of benefits "should not be interpreted as an admission of present or ongoing liability" and that "further clarification is needed to assess [Smith-Emerson's] level of functional capacity." AR 598-99.

Smith-Emerson could work in a full-time "sedentary" capacity. Id. at 4-5.  Four months later, in March 2012, Dr. Nguyen stated that Smith-Emerson would likely need a four-to-six month leave of absence from work due to pain and numbness in her "upper extremity" and the fingers of her left hand.  Id. at 7.

Also in March 2012, Smith-Emerson consulted with six more medical professionals: Dr. John Chi, APRN Martha Porfido-Bellisle, Dr. Andrew Jaffe, APRN Steve Arvin, Dr. Matthew Vestal, and Dr. Mildred LaFontaine.  Id. at 7-9.  At these consultations, Smith-Emerson complained of neck pain and muscle spasms.  Id.  She also reported tailbone pain.  Id. at 8.  Dr. Vestal stated that when examined, Smith-Emerson was "[u]nable to flex and extend, pitch, yaw and roll [her] neck" on command but was "easily able to fully range neck" when "distracted by other tasks."  Id. at 9.  None of these doctors stated whether Smith-Emerson would be capable of working at that time.

In April 2012, Smith-Emerson completed an "Activities Questionnaire" at Liberty's request.  She stated that she "spent most of the day in bed . . . because of pain," "was able to sit, stand or walk for only less than an hour a day," and loved to garden but was "unable to do so at this time because of [her] injury."  Id. at 10.  Also in April 2012, Smith-Emerson again

4

saw Dr. Nguyen, who reported that she "appears quite comfortable, despite verbalizing severe neck pain." Id. at 11. Dr. Nguyen signed a restrictions form indicating that Smith-Emerson could perform light-duty work on a full-time basis. Id. at 12.

Days later, Smith-Emerson received care from chiropractor Melissa Savicky. Id. Smith-Emerson reported to Dr. Savicky that she had not gotten out of bed the previous Saturday due to severe pain. Id. During the appointment, Smith-Emerson apparently went into full-body spasms upon light touch. Id. Despite this, Dr. Savicky signed a restrictions form indicating that Smith-Emerson could perform sedentary work on a full-time basis, with some restrictions. Id.

In May 2012, Smith-Emerson visited Dr. Robert Spencer to address her ongoing complaints of pain. Id. at 13. Dr. Spencer diagnosed Smith-Emerson with "definite" headaches, neck, and back pain, "possible cervical radiculitus," "possible lumbosacral radiculitus," and "possible extremity pain." Id. at 13-14.

In May 2012, Liberty hired a private investigative firm, New England Risk Management ("NERM"), to conduct video surveillance of Smith-Emerson. Id. at 15. NERM issued a report

indicating that Smith-Emerson was observed on several days in May 2012 "raking grass and dirt in her yard using both hands, bending without restriction, moving quickly without restriction or outward signs of pain, scooping grass and dirt into a trash bag, lifting and carrying the bag, and squatting," among other outdoor activities.  Id.

In June 2012, Smith-Emerson was seen by APRN Kim Keaton, who prescribed pain medication and indicated "no work for now." Id. at 14.  Keaton also reported that Smith-Emerson had "chronic neck pain" but appeared to be "well-developed, well-nourished, [and] in no acute distress."  Id. at 17.

Also in June 2012, Dr. Philippe Chemaly submitted a report based on his review of Smith-Emerson's medical file.  Id. at 15. On June 8, 2012, before receiving NERM's surveillance videos, Dr. Chemaly indicated that Smith-Emerson likely suffered from "cervical radiculitus," but not "cervical radiculopathy" or "lumbar radiculitus."  Id.  He also stated that Smith-Emerson's reports of chronic pain and weakness were likely true based on his review of Dr. Nguyen's reports.  Id. at 15-16.  Dr. Chemaly concluded that, given his review of the medical documentation, Smith-Emerson would be able to "return to work in a sedentary position."  Id.

A week later, however, on June 15, 2012, Dr. Chemaly revised his opinion, issuing an addendum to his report that addressed the video surveillance showing Smith-Emerson doing yard work.  Id. at 16-17.  In his addendum, Dr. Chemaly stated that Smith-Emerson's "ability to lift, squat, bend, stoop, lift, carry, and open and close vehicle doors" was "directly inconsistent" with Smith-Emerson's "reported functional capacity."  Id. at 16.  In light of the video footage, Dr. Chemaly concluded that Smith-Emerson could work "at minimum in a light duty setting in a permanent eight hour day full time work position."  Id.

In July 2012, APRN Keaton stated that, based on her in-office observations of Smith-Emerson, Keaton did not "disagree with a sedentary position in a full duty work capacity."  Id. at 17-18.  Keaton also indicated that she would like to continue with pain medication to see if Smith-Emerson's condition would improve.  Id.

In October, November, and December 2012, Smith-Emerson was seen by Steven Toscano, PA-C.  Id. at 20-21.  Smith-Emerson reported that her pain was a "constant" 9 to 10 out of 10, and that daily tasks like driving, sitting, standing, and walking aggravated her pain symptoms.  Id. at 20.  Upon examination,

7

Toscano found Smith-Emerson to be in "no acute distress" and prescribed pain medications.  Id.  On November 30, 2012, Toscano indicated that Smith-Emerson was "unable to work."  Id. at 21. A month later, APRN Keaton agreed, stating that Smith-Emerson was unable to "resume any type of work at this time."  Id.

In February and March 2013, NERM took more video surveillance of Smith-Emerson, who was observed driving, entering a tanning salon, climbing over snowbanks, and "walking quickly in a fluid manner," among other activities.  Id. at 22. In April 2013, Smith-Emerson filled out another "Activities Questionnaire" stating that she spent "most of her day" in bed, only left the house for medical appointments, went outside "not even once a week," and could not use a computer.  Id. at 24. She reported that she could "barely move" and that her pain was "10 out of 10 all the time."  Id.

From February to May 2013, Smith-Emerson saw psychologist Rebecca S. Johnston.  Id. at 21-24.  Dr. Johnston reported that Smith-Emerson was experiencing pain and muscle spasms, and that Smith-Emerson said she spends "most of the day in bed."  Id. at 21-22.  Dr. Johnston indicated that Smith-Emerson appeared to be "only comfortable lying down" and that "staying out of bed is her major goal at present."  Id. at 24.

In April 2013, Smith-Emerson saw Dr. David Tung for neck and arm pain.  Id.  Dr. Tung indicated that Smith-Emerson suffered from Complex Regional Pain Syndrome/Reflex Sympathetic Dystrophy, and signed a restrictions form stating that Smith-Emerson could perform sedentary work on a full-time basis, although her return to work was "uncertain at that time."  Id. at 24-25.

In August 2013, unrelated to the Liberty policy, the Social Security Administration ("SSA") approved disability benefits for Smith-Emerson.  Id. at 26.  The approval notice indicated that Smith-Emerson had become disabled in December 2011, but did not provide detail on the SSA's basis for its conclusion.  Id.

That same month, at Liberty's request, Dr. David Monti issued a medical report after reviewing Smith-Emerson's file. Id. at 27.  Dr. Monti's report stated that, from December 2011 to May 2012 Smith-Emerson would have had a "less than sedentary capacity" due to neck pain.  Id.  Since that time, however, Dr. Monti indicated that Smith-Emerson would have "at least a light duty work capacity," as demonstrated by videos of her performing multiple activities, including yard work.  Id.  PA-C Toscano disagreed with Dr. Monti's light duty work classification, however, stating that he thought Smith-Emerson still needed to

be in "sedentary work classification" because she had Complex
Regional Pain Syndrome (CPRS).  Id.

Also in August 2013, two more professionals gave opinions
regarding Smith-Emerson's capacity to work.  APRN Keaton
indicated that she did not "disagree with a sedentary position
in a part time duty work capacity," but stated that Smith-
Emerson's "pain issues and limited range of motion with her neck
and left arm continue to be prohibitive for return to work."
Id. at 28.  In addition, neurosurgeon Henry Pallatroni, who had
evaluated Smith-Emerson the previous month, signed a
restrictions form indicating that she was "completely disabled."
Id.

Later in August 2013, another private investigative firm,
ACI Investigative Group, issued a report concerning additional
surveillance of Smith-Emerson.  Id. at 28-29.  According to the
report, Smith-Emerson was observed earlier in August doing more
yard work, walking on a treadmill at a gym; driving to a
department store, shopping, and carrying two large plastic bags
to her car; carrying grocery bags; taking a vehicle for a test
drive; sitting by a pool; and generally going about her business
without visible restrictions on her movement.  Id.  Liberty
submitted this surveillance to Dr. Monti, who stated that there

were "inconsistencies" between Smith-Emerson's activities questionnaire and the surveillance.  Id. at 29-30.  Dr. Monti pointed out that Smith-Emerson claimed in her questionnaire to be in bed all day and suffer debilitating pain, but was "very active" in the videos and did not appear to have a restricted range of motion.  Id.  He concluded that Smith-Emerson would have "at least a light duty work capacity" and "thus would be able to work in a sedentary capacity that is sustained during this time."  Id. at 30.

On September 5, 2013, Liberty informed Smith-Emerson by letter that it was terminating her long-term disability benefits because she no longer met the Plan's definition of "disability." Id. at 31.  Liberty noted that although Smith-Emerson likely had "chronic pain," her reported pain was inconsistent with video surveillance taken of her.  AR 188-198.  The letter quoted extensively from surveillance reports of Smith-Emerson gardening, shopping, and walking on a treadmill.  Id.  It stated that, although Smith-Emerson's treating providers indicated that she was "totally disabled," Liberty's review of the medical and non-medical evidence suggested that she could perform the duties of a Loan Officer on a full-time basis.  AR 197.  The letter informed Smith-Emerson that she had the right to request a

review of the denial from Liberty and provided details on how to

do so.  Id.

Soon after the denial letter, on September 17, 2013, Smith-

Emerson saw a physical therapist, Rachel Heath.  Doc. No. 14 at

31.  Heath reported that Smith-Emerson demonstrated "less than

maximal physical effort during physical testing," but that

testing showed that Smith-Emerson could perform basic functions

like walking, standing, sitting, and making repetitive motions

frequently.  Id.  Heath concluded that Smith-Emerson could

"work/function part-time, 2-4 hours/day and 5 days/week at a

sedentary capacity," provided she change positions every 15-20

minutes.  Id.  On September 26, 2013, Dr. Tung similarly

concluded that Smith-Emerson is "in the sedentary work class

classification and is able to work at least part-time for 20-25

hours per week in 4 hour shifts."  Id. at 31-32.

A month later, on October 23, 2013, Smith-Emerson started a

new part-time job as a Marketing Representative for Horizon

Settlement Services.  Id. at 32.  She worked at Horizon until

April 2014, when she states that her "hours were cut back

gradually because of [her] pain."  Doc. No. 28-1 at 1.

On November 27, 2013, Smith-Emerson, assisted by counsel,

requested a review of Liberty's denial decision.  Doc. No. 14 at

33.  Smith-Emerson's request stated that she suffered from Complex Regional Pain Syndrome and highlighted her continued pain, headaches, complications from neck surgeries, and weakness in limbs and hands.  AR 92-104.  It also addressed aspects of the video surveillance and challenged certain characterizations of Smith-Emerson's activities.[4]  AR 101-02.

On January 20, 2014, Dr. Steven Lobel issued a report for Liberty after reviewing Smith-Emerson's medical file.  Doc. No. 14 at 34.  Dr. Lobel concluded that Smith-Emerson could sustain a full-time work capacity, with certain restrictions like sitting only 60 minutes at a time and not using ladders or lifting more than 40 pounds.  Id.  He noted the inconsistencies between Smith-Emerson's reports that she spent most of the day in bed and the videos showing her leading an apparently active lifestyle.[5]  See id. at 35.

---

[4] For example, Smith-Emerson did not dispute that the video depicted her pulling weeds from her front lawn, but stated that the "weeds and dead flowers around the mailbox were minimal and did not require more than a few easy pulls with her right hand." AR 101.  "This hardly qualifies as gardening," she wrote.  Id. Likewise, Smith-Emerson stated that the shopping bags that she was observed carrying contained pillows, and she was carrying them in her right hand, not her "impaired left."  Id.  On a subsequent day, the bags she was seen carrying held "hamburger and hot dog rolls and chips," which were only "lightweight items" that she carried with her right hand.  Id.

[5] Dr. Lobel noted that there was "a complete discordance between

13

The next day, January 21, 2014, Liberty sent a letter reaffirming its previous termination decision and denying Smith-Emerson's appeal.  Id.  The letter, from Liberty Appeals Consultant Kimberly Murray, referenced the opinions of Dr. Monti and Dr. Lobel, both of whom had concluded that Smith-Emerson was capable of working in a sedentary or light work capacity.  AR 49-54.  It noted that Liberty had spoken with PA-C Toscano and had reviewed the medical opinion of Dr. Pallatroni (who had previously indicated Smith-Emerson was "completely disabled"). AR 51.  It also highlighted the video surveillance and indicated that it had considered – but ultimately disagreed with – the SSA's conclusion that Smith-Emerson was disabled.  AR 53.  That letter terminated Liberty's internal review of Smith-Emerson's claim.

The next month, February 2014, Smith-Emerson brought an ERISA claim against Liberty in Merrimack County Superior Court, challenging Liberty's determination that she was not "disabled." Doc. No. 1.  Liberty removed the case to this Court.  Id.  In May 2015, I rejected Smith-Emerson's motion for de novo review and ruled that her claim would be subject to deferential

---

the imaging, exams, EMGs, treatments, and surveillance."  Doc. No. 14 at 35.

"arbitrary and capricious" review.  Doc. No. 18.  The parties

then filed cross-motions for judgment on the administrative

record.[6]  Doc. Nos. 22, 25.

## II. <u>STANDARD OF REVIEW</u>

---

[6]     In her motion for judgment on the administrative record,
Smith-Emerson attached several exhibits that were not part of
the administrative record.  Doc. No. 22.  One of these exhibits,
an affidavit from Smith-Emerson, noted that a woman seen jogging
in one of the surveillance videos was not Smith-Emerson, but
rather Smith-Emerson's neighbor.  Doc. No. 22-6.  In response,
Liberty filed its own motion for judgment on the administrative
record and attached an updated medical report from Dr. Lobel –
an item also not in the administrative record.  Doc. No. 25-2.
Liberty subsequently filed a motion to strike Smith-Emerson's
"extra-administrative record evidence," but asked that I retain
and consider its own supplementary exhibit.  <u>See</u> Doc. No. 31.
In turn, Smith-Emerson filed an objection to Liberty's motion to
strike.  Doc. No. 34.
     Generally, a party must show a "very good reason" to amend
the administrative record.  Orndorf v. Paul Revere Life Ins.
Co., 404 F.3d 510, 519 (1st Cir. 2005).  Here, however, I need
not determine whether the parties meet this standard because the
evidence submitted has no effect on the outcome of the case.
Although Smith-Emerson claims that Liberty "materially based"
its decision on the jogging video, see Doc. No. 34 at 1, this
argument is contradicted by the record.  Private firms hired by
Liberty took hours of video surveillance of Smith-Emerson over a
number of days and submitted detailed reports to Liberty.  In
its denial letters, Liberty quoted extensively from these
surveillance reports to support its termination of Smith-
Emerson's benefits.  <u>See</u> AR 49-54, 188-98.  Neither letter,
however, mentions a video of Smith-Emerson jogging, let alone
indicates that surveillance of Smith-Emerson jogging contributed
to the denial decision.  AR 49-54, 188-98.  In light of the
substantial evidence supporting Liberty's conclusion, the
"extra-administrative record" evidence is therefore not material
and I need not decide whether Smith-Emerson has advanced a "very
good reason" for me to consider it.

The standard of review in an ERISA case differs from that in an ordinary civil case, where summary judgment is designed to screen out cases that raise no trial-worthy issues.  See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  "In the ERISA context, summary judgment is merely a vehicle for deciding the case[,]" in lieu of a trial.  Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006).  Rather than consider affidavits and other evidence submitted by the parties, the court reviews the denial of ERISA benefits based "solely on the administrative record," and neither party is entitled to factual inferences in its favor.  Id.  Thus, "in a very real sense, the district court sits more as an appellate tribunal than as a trial court" in deciding whether to uphold the administrative decision.  Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002).

Where, as here, an ERISA benefits plan gives its administrator discretion to decide whether an employee is eligible for benefits, "the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion."  Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (internal citation and punctuation omitted).  This standard is "generous" to the

administrator, but "is not a rubber stamp." Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2009). The administrator's decision must be "reasoned and supported by substantial evidence." Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009). "Evidence is substantial if it is reasonably sufficient to support a conclusion." Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 87 (1st Cir. 2008). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." Wright, 402 F.3d at 74.

### III.  ANALYSIS

Smith-Emerson sues under ERISA § 502(a)(1)(B), which allows participants in certain benefits plans to bring civil actions to "recover benefits due to [them] under the terms of [their] plan." 29 U.S.C. § 1132(a)(1)(B). Smith-Emerson argues that Liberty's decision to terminate disability benefits was arbitrary and capricious, and requests either judgment in her favor based on the administrative record or a remand to Liberty to reconsider its decision.

Smith-Emerson presents four principal arguments. First, she argues that Liberty's reliance on Dr. Monti's medical

17

opinion was essentially erroneous.  Doc. No. 22-1 at 4.  Second,
Smith-Emerson contends that Liberty could not permissibly
conclude that she was disabled and grant her benefits in June
2012, and then reverse its decision and terminate benefits in
September 2013 based on the same evidence.  Id. at 4-5.  Third,
she claims that Liberty wrongfully based its decision on video
surveillance without making that surveillance available to
Smith-Emerson or her medical providers.  Doc. No. 28 at 3.
Finally, Smith-Emerson argues that an overall review of Smith-
Emerson's medical history shows that she has CRPS, is disabled,
and is unable to work as a loan officer.  Doc. No. 22-1 at 9-28.
I address, and ultimately reject, each argument below.

**A.   Dr. Monti's Medical Opinion**

Smith-Emerson challenges Liberty's reliance on Dr. Monti's
medical opinion in its first denial letter.  She essentially
advances two points: (1) Dr. Monti recommended that Smith-
Emerson receive an independent medical examination ("IME"), but
Liberty never requested one; and (2) Dr. Monti ignored certain
opinions of Smith-Emerson's doctors in concluding that she could
work in a sedentary or light-duty job.  These arguments are
unpersuasive.

First, the record contradicts Smith-Emerson's claims that

18

Liberty "ignore[d]" Dr. Monti's recommendation for an IME.  See

Doc. No. 22-1 at 5.  Rather, in its January 2014 appeal

decision, Liberty stated that it sent Smith-Emerson's file to

Dr. Lobel for an "independent medical review."  AR 52.  Dr.

Lobel reviewed Dr. Monti's opinions and supplemented them with

his own, ultimately concluding that Smith-Emerson could sustain

a full-time work capacity with certain restrictions.  AR 52-53.

 More fundamentally, Smith-Emerson received numerous

independent medical evaluations in the months leading up to

Liberty's decision.  Smith-Emerson saw over twenty medical

professionals during a period of two years, the vast majority of

whom Smith-Emerson herself retained.  See generally Doc. No. 14.

Several of these medical professionals – again, retained by

Smith-Emerson – concluded that she could work in a sedentary

classification.[7]  See id. at 4-5 (Dr. Nguyen); 25, 31-32 (Dr.

Tung); 12 (Dr. Savicky); 17-18, 28 (APRN Keaton); 27 (PA-C

Toscano).  Liberty states that it reviewed the opinions of

---

[7] Notably, Smith-Emerson does not appear to challenge Liberty's
assertion that her occupation of Loan Officer is either
"sedentary" or "light physical demand."  See Doc. No. 14 at 13.
As such, the conclusions of several of Smith-Emerson's doctors
that she could perform "sedentary" work appear only to undermine
her argument that she is incapable of performing the duties of a
loan officer.

Smith-Emerson's providers, including four who concluded that she could work in a sedentary position.  AR 49-54, 188-198.  Liberty requested the opinion of one of these providers, PA-C Toscano, and Dr. Monti responded to Toscano in his report.  AR 193, 196.  Liberty's failure, therefore, to order yet another medical review is simply insufficient to show that its ruling was arbitrary and capricious.

Second, Smith-Emerson criticizes Dr. Monti's conclusion that she might have "reflex sympathetic dystrophy" ("RSD") but not CRPS.  See Doc. No. 22-1 at 4-5.  This argument does not, however, explain why this diagnosis renders Liberty's decision arbitrary and capricious.  Indeed, Smith-Emerson's own providers appear to disagree about her exact diagnosis.  See Doc. No. 14 (showing various doctors concluding that Smith-Emerson suffered from "possible cervical radiculitus," "possible lumbosacral radiculitus," "chronic pain," "chronic neck pain," "reflex sympathetic dystrophy," and "failed neck syndrome," among other conditions).  Although several providers did conclude that Smith-Emerson suffered from CRPS, others disagreed.  Compare id. at 35 (Dr. Lobel) and AR 196 (Dr. Monti), with Doc. No. 14 at 27 (PA-C Toscano) and id. at 32 (Dr. Devanny).[8]  The fact that

---

[8] Dr. Tung, noted that she suffered from "complex regional pain

Liberty's doctor reviewed the wide variety of medical diagnoses and chose one adequately-supported conclusion over another is not unreasonable.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician").  Moreover, Smith-Emerson makes no effort to show why a finding of RSD rather than CRPS affects whether she is "disabled" within the meaning of the Plan.  As such, I reject her argument.

**B.   <u>Liberty's Termination of Benefits</u>**

Smith-Emerson argues that Liberty acted unreasonably in granting Smith-Emerson disability benefits from December 2011 through September 2013, and then terminating those benefits based on the same medical evidence.  <u>See</u> Doc. No. 22-1 at 4-6. This argument is unpersuasive, however, because it ignores the fact that Liberty initially paid benefits to Smith-Emerson under a "reservation of rights," and not a finding that she was disabled.

None of Liberty's initial correspondence with Smith-Emerson indicated that she had a "disability" within the meaning of the

_____

syndrome/reflex sympathetic dystrophy" – an indication that
these diagnoses are closely linked.  Doc. No. 14 at 24.

Plan.  Liberty first approved Smith-Emerson's request for Short

Term Disability benefits in December 2011.  AR 996.  As proof of

this, the record only contains an email from a Liberty employee

to Citizens with a short note indicating that Smith-Emerson's

"claim" had been approved through January 2012.  Id.  The email

does not, however, state whether Smith-Emerson is "disabled" or

what condition she might have.  Id.  The record includes similar

emails extending benefits on a month-to-month basis until March

19, 2012, when Liberty sent a letter to Smith-Emerson requesting

more information to support her claim.  See AR 875, 877, 956,

969, 986.  The March 19 letter similarly does not indicate that

Liberty had found Smith-Emerson to be "disabled" under the Plan;

it only states that Short Term Disability benefits had been

approved through March.  AR 875.

In July 2012, Liberty sent a letter to Smith-Emerson

granting Long Term Disability benefits under a "Reservation of

Rights."  Doc. No. 14 at 18.  That letter stated that Liberty

had made no final determination regarding Smith-Emerson's

alleged disability.[9]  Id.  Following that letter, Liberty made no

---

[9] The letter states: "Your level of impairment remains uncertain
therefore further clarification is needed to assess your level
of functional capacity.  You will continue to receive benefits
during this review; however, this payment, or any future
payments, should not be interpreted as an admission of present

22

other statements concerning Smith-Emerson's disability until it terminated benefits in September 2013.

The evidence therefore does not support Smith-Emerson's assertion that Liberty initially found that she was disabled. To the contrary, Liberty granted her initial Long Term disability benefits under a carefully-worded reservation of rights.  AR 598-99.  As such, Smith-Emerson's contention that Liberty arbitrarily reversed its own disability finding is baseless because Liberty made no such initial finding.  I therefore reject her argument.[10]

_____

or ongoing liability."  AR 598-99.

[10]   Smith-Emerson's reliance on Cook and Fifield are similarly misplaced.  In Cook, Liberty relied primarily on the medical opinion of a doctor to assess a claimant's disability.  For months, that doctor advised that the claimant was disabled.  See Cook v. Liberty Life Assur. Co. of Bos., 320 F.3d 11, 14-16 (1st Cir. 2003).  Later, the doctor submitted a notice indicating that the claimant could work 40 hours a week, and Liberty terminated the claimant's benefits.  Id. at 16.  Soon after, the doctor realized that he had made a clerical error in filling out a restrictions form, and promptly informed Liberty that his initial opinion was erroneous, and that the claimant was in fact disabled.  Id. at 15-16.  Liberty disregarded this updated opinion, however, and ruled that the claimant was not disabled without pointing to any contradictory medical evidence.  Id. at 17.  The First Circuit concluded that Liberty's actions were arbitrary and capricious because Liberty chose initially to credit the doctor's medical findings, but later reversed course without any explanation or other substantial evidence discrediting the doctor's opinion.  Id. at 23.  Here, by contrast, Liberty has not relied on the advice of one doctor, but several doctors, many of whom concluded that Smith-Emerson

C.    __Video Surveillance__

     Smith-Emerson next maintains that Liberty wrongfully based

its decision on video surveillance without making that

surveillance available to Smith-Emerson or her medical

providers.  See Doc. No. 28 at 3.  She argues that Liberty

"sandbag[ged]" her by only sending copies of the surveillance

videos after it made its termination decision.  Id.  This

argument is unpersuasive.

     Although the record does show that Liberty provided the

videos to Smith-Emerson only after its initial September 2013

denial letter, Smith-Emerson had ample opportunity to review and

respond to the videos in its subsequent appeal.  In fact, the

record shows that Smith-Emerson *did* review the videos, and

actually submitted detailed rebuttals to the surveillance

findings to Liberty's appeal unit.  See AR 100-102.  Moreover,

---

was capable of working, and has not credited favorable opinions
in the face of substantial evidence to the contrary.
     Fifield is similarly inapplicable because it dealt with an
insurer who ruled that a claimant was disabled for one month,
but ceased to be disabled after that month, despite no evidence
to show that the disability had ceased.  See Fifield v. HM Life
Ins. Co., 900 F. Supp. 2d 110, 114 (D.N.H. 2012).  Here, unlike
Fifield, Liberty did not make a contradictory finding based on
the same evidence; rather, it granted initial benefits under a
reservation of rights and later exercised those rights to
terminate benefits.

Liberty sent the videos directly to Dr. Pallantroni and PA-C
Toscano in early September 2013, giving them sufficient time to
address the videos prior to the January 2014 appeal decision if
they wished.  AR 185-86.  Smith-Emerson's claim is therefore
baseless.

>       **D.    Smith-Emerson's Disability**

Finally, Smith-Emerson argues at length that she is,
contrary to Liberty's conclusion, incapable of working as a loan
officer.  She provides extensive information on CPRS, her mental
health problems, and various doctors' opinions of her medical
condition.  See generally Doc. No. 22-1.  Yet, her argument
misconstrues the nature of the motion before me.  My role is not
to review the wide range of medical evidence and determine
whether Smith-Emerson is physically capable of doing her job.
Rather, I must focus solely on the conclusion that Liberty has
already made – that Smith-Emerson could work – and ask whether
or not that decision was supported by "substantial evidence."
See Medina, 588 F.3d at 45.  Where a decision is supported by
substantial evidence, I "must" uphold it, even in the face of
contrary evidence.  See id.; Stamp, 531 F.3d at 87.

Smith-Emerson's arguments fail to persuade.  Liberty's
decision to terminate benefits was supported by an array of

medical and non-medical evidence.  Each of Liberty's reviewing doctors – Dr. Chemaly, Dr. Monti, and Dr. Lobel – examined Smith-Emerson's voluminous medical records and concluded that she was capable of working a full-time sedentary or light-duty job.  Further, five of Smith-Emerson's own treating providers concluded, at various times, that Smith-Emerson was capable of performing either a sedentary or light-duty job.[11]  Only one doctor – Dr. Pallatroni – concluded that she was entirely disabled and incapable of working, and he reached this conclusion without reviewing the surveillance videos.[12]  See Doc. No. 14 at 28.

The surveillance videos reinforce the conclusion that Smith-Emerson is capable of working a sedentary or light-duty

---

[11] Smith-Emerson appears to argue that the opinions of her treating providers should be given more weight than Liberty's doctors, who merely reviewed her medical file.  See Doc. No. 22-1 at 5.  I note, however, that the First Circuit has "squarely held that an insurer is not required to physically examine a claimant, and that benefit determinations may be based on reviews of medical records."  Richards v. Hewlett-Packard Corp., 592 F.3d 232, 241 (1st Cir. 2010).  Moreover, even if I accept Smith-Emerson's position, several of her own examining providers concluded that she could work full-time in a sedentary capacity. Doc. No. 14 at 3-4 (Dr. Nguyen); 12 (Dr. Savicky); 18-19 (APRN Keaton); 25 (Dr. Tung); 27 (PA-C Toscano).

[12] The record shows that Liberty sent copies of the surveillance videos to Dr. Pallatroni in September 2013, but does not indicate whether he commented on them or revised his opinion in any way.  See AR 185.

job.  In the videos, Smith-Emerson was observed gardening, walking on a treadmill, shopping, and carrying bags, among other activities.  Id. at 28-29.  Although she seeks to minimize these observations, she does not refute them.  See AR 100-102. Indeed, Smith-Emerson does not really address the wide discrepancies between her reported activity – spending "most of the day in bed" with debilitating pain – and the surveillance showing her leading a generally active lifestyle.  Compare Doc. No. 14 at 24 with id. at 28-29.  At a minimum, the videos lend support to Liberty's conclusion that she could perform a job that requires mostly sitting, typing, and answering the phone. See id. at 1, 13.

I need not present an exhaustive chronicling of the rest of the evidence buttressing Liberty's decision.  Under the deferential standard of review applied here, my inquiry is necessarily circumscribed.  The plaintiff must show that the plan administrator's decision was not supported by substantial evidence, not merely that the evidence might allow a different conclusion.  See Leahy, 315 F.3d at 18-19.  Smith-Emerson fails to carry her burden here.  I therefore grant Liberty's motion for judgment on the administrative record.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, I grant Liberty's motion for judgment on the administrative record (Doc. No. 25) and deny Smith-Emerson's motion for judgment on the administrative record (Doc. No. 22).

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

December 9, 2015

cc:  Charles G. Douglas, III, Esq.
     William D. Pandolph, Esq.